DUANE K.THOMPSON
Email:  thompsond@sec.gov
100 F Street, N.W.
Washington, D.C.  20549
Telephone: (202) 551-7159
Facsimile: (202) 772-9246

LOCAL COUNSEL:
GARY Y. LEUNG, (Cal. Bar No. 302928)
Email: leungg@sec.gov
U.S. Securities and Exchange Commission
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

Attorneys for Plaintiff
Securities and Exchange Commission

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### Southern Division

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| GUY SCOTT GRIFFITHE, ROBERT WILLIAM RUSSELL, RENEWABLE TECHNOLOGIES SOLUTION, INC., GREEN ACRES PHARMS, LLC, and SMRB, LLC, | |
| Defendants, and | |
| SONJA MARIE RUSSELL, | |
| Relief Defendant. | |

Plaintiff, Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint against Guy Scott Griffithe, Robert William Russell, Renewable Technologies Solution, Inc., Green Acres Pharms, LLC, and SMRB, LLC (collectively referred to as "Defendants"), hereby alleges as follows:

## JURISDICTION AND VENUE

1.     The Commission brings this action pursuant to Sections 20(b) and 20(c) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)], and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. §§ 78u(d)* and *78u(e)*].

2.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [*15 U.S.C. § 77v*], Section 27 of the Exchange Act [*15 U.S.C. § 78aa*], and 28 U.S.C. § 1331.

3.     Venue is proper in this Court pursuant to Securities Act Section 22(a) [*15 U.S.C. § 77v(a)*] and Exchange Act Section 27 [*15 U.S.C. § 78aa*], as acts, practices, and courses of business constituting violations alleged herein occurred within the Central District of California.  Defendant Guy Griffithe resides within the Central District of California.  Defendants Renewable Technologies Solution, Inc. and Green Acres Pharms, LLC have their principal places of business within this District.  Many victims of the Defendants' fraud scheme reside within this District. Many of the fraudulent securities transactions occurred within this District.

4.     Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein.

## SUMMARY

5.     Defendants Guy Scott Griffithe ("Griffithe") and Robert William Russell ("Russell"), through the Defendant companies they respectively controlled, Renewable Technologies Solution, Inc. ("RTSI"), Green Acres Pharms, LLC ("GAP"), and SMRB, LLC ("SMRB"), defrauded at least 25 investors of

1

approximately $4.85 million or more in a securities offering fraud scheme. The Commission charges the Defendants based upon their respective roles in perpetrating the scheme described herein.

6.    From approximately August 2015 to December 2017, Defendants sold investors purported ownership interests in SMRB, a company in Washington State that held a license to produce and process marijuana under Washington's recreational cannabis laws. Defendants sold securities in SMRB to investors through Griffithe's holding company RTSI, and later GAP, which purported to own a minority interest in SMRB.

7.    Investors were told that their investment capital would be used to operate and improve SMRB's cannabis business and that SMRB's resulting profits would be distributed to them quarterly in proportion to the equity they purchased.

8.    Defendants sold securities interests to investors that were fictitious and essentially worthless. The investors did not actually acquire any *bona fide* ownership stake in SMRB.

9.    Additionally, Griffithe misappropriated over $1.8 million in investor money for personal uses and other inappropriate expenditures. Among other things, Griffithe used investor money towards the purchase of luxury cars for himself and others, and to fund numerous other personal and unrelated business expenditures.

10.    Russell and his wife, Relief Defendant Sonja Marie Russell, also unjustly benefitted from the misuse of investor money. Approximately $1.7 million was deposited into personal bank accounts Russell shared with his wife, and other money was spent for their personal benefit, including towards the purchase of a yacht.

11.    Defendants also led investors to believe that SMRB was profitable and paying profit distributions. In reality, SMRB was never profitable and the money paid to investors was funded, in part, from other capital invested in the scheme in Ponzi-like fashion.

12.     By engaging in the conduct described herein, the Defendants have violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*], and Section 17(a) of the Securities Act [*17 U.S.C. § 77q(a)*].  Griffithe, RTSI, and GAP also violated, and unless restrained and enjoined will continue to violate, Securities Act Sections 5(a) and (c) [*15 U.S.C. §§ 77e(a) and e(c)*].

13.     Consequently, the Commission now brings this action to enforce the securities laws; to seek permanent injunctions against each of the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business set forth herein; to disgorge all ill-gotten gains, plus prejudgment interest thereon, wrongfully obtained as a result of their illegal conduct; to pay civil penalties; and to request other relief as set forth herein and as the Court may find just and appropriate.

## **DEFENDANTS**

14.     **Guy Scott Griffithe ("Griffithe")**, age 40, is a resident of Laguna Niguel, California.  Griffithe is the President, Secretary, and Treasurer of Renewable Technologies Solution, Inc. and controls its business operations and bank accounts. Griffithe is also a member and Manager of Green Acres Pharms, LLC and controls its business operations and bank accounts.  Griffithe executed investment contracts with investors in his capacity as an officer and control person of Renewable Technologies Solution, Inc. and Green Acres Pharms, LLC.  Griffithe, who describes himself as an executive in the motion picture industry, is also President and a member of the Board of Directors of Bridgegate Pictures Corp., a Nevada corporation whose common stock trades on the OTC Markets.

15.     **Robert William Russell ("Russell")**, age 60, is a resident of Duvall, Washington.  Russell and his wife, Relief Defendant Sonja Marie Russell ("Sonja Russell"), are the only two owners and governor members of SMRB.  Russell controlled SMRB.  According to state incorporation records, Russell is also a

3

Director of Renewable Technologies Solution, Inc. and managing member of Green Acres Pharms, LLC.

16. **Renewable Technologies Solution, Inc. ("RTSI")** is a Nevada corporation with a last known address for its principal place of business in Laguna Niguel, California.  RTSI was originally formed in 2004 under the name Bridgegate Capital, Inc. and later re-named Renewable Technologies Solution, Inc.  RTSI also did business under the fictitious name "Bridgegate Marketing Specialist."  Griffithe controlled RTSI.  Griffithe was RTSI's President, Secretary and Treasurer, and Russell was Director of RTSI.  RTSI issued and sold investment contracts to investors that fraudulently purported to represent an interest in SMRB, LLC.

17. **Green Acres Pharms, LLC ("GAP")** is a Nevada limited liability company with a last known address for its principal place of business in Laguna Niguel, California.  GAP was formed in 2016 as a successor-in-interest to RTSI for the purpose of holding, offering, and selling RTSI's purported equity in SMRB, LLC.  Griffithe and Russell are named as the two managing members, or "Directors," of GAP.  Griffithe controlled GAP.  GAP issued and sold investment contracts to investors that fraudulently purported to represent an interest in SMRB, LLC.

18. **SMRB, LLC ("SMRB")** is a Washington-registered limited liability company with its principal place of business in Anacortes, Washington.  SMRB was formed in 2013.  In 2015, SMRB obtained a license from the Washington State Liquor and Cannabis Board to produce and process marijuana under Washington's recreational cannabis laws.  SMRB does business under the trade names "Green Acre Pharms" and "Green Acres Pharms," and is also sometimes known as "Green Acres Pharm."  Russell and his wife, Relief Defendant Sonja Marie Russell, are the only two owners and governor members of SMRB.  Russell controls SMRB.

## RELIEF DEFENDANT

19. **Sonja Marie Russell ("Sonja Russell")**, age 59, is a resident of Duvall, Washington.  Sonja Russell is the wife of Defendant Robert W. Russell.  Sonja

Russell is one of the two owners and governor members of SMRB, along with her husband Defendant Robert W. Russell.  Sonja Russell was unjustly enriched by receiving proceeds from the fraudulent conduct alleged herein in the form of cash, property, and other benefits.

## FACTUAL ALLEGATIONS

20.     Defendants, each acting with scienter, perpetrated a long-running scheme to defraud investors in connection with the offer, purchase, or sale of unregistered securities and to use the money raised in such offerings to unjustly enrich themselves, Relief Defendant Sonja Russell, and others.

### *Origins of Defendants' Investment Fraud Scheme*

21.     In approximately November 2013, Russell and Sonja Russell formed SMRB in the State of Washington to engage in activities associated with producing and processing marijuana.

22.     At the time of SMRB's formation, and continuing at all times to the present, Russell and Sonja Russell each owned 50% of SMRB and have served as the limited liability company's only two members and governors.  Russell controlled SMRB.

23.     In approximately March 2014, SMRB filed an application with the Washington State Liquor and Cannabis Board to obtain a license to grow and process marijuana for the recreational market in Washington.  In approximately August 2015, the Liquor and Cannabis Board issued the license to SMRB.

24.     In approximately July 2015, Griffithe and RTSI made an agreement with Russell and SMRB to pay $1.5 million in exchange for a stake in SMRB that conveyed the right to receive a percentage of the net income generated by SMRB.

25.     Defendants contemplated that Griffithe would use RTSI to offer and sell these securities of SMRB to other investors.  For example, an SMRB corporate resolution with an effective date of July 19, 2015 pertaining to Griffithe's and RTSI's $1.5 million investment recognized that RTSI had "the right to sell its equity

position" to investors or "pledge it for equity raise."

26.     Under state law, SMRB was required to request and receive pre-approval from the Washington State Liquor and Cannabis Board before raising money from investors.  Washington law also required all owners of a licensed marijuana business, and anyone who has a right to receive profits from a marijuana business, to be Washington residents and to be investigated and approved by the Liquor and Cannabis Board prior to investing.

27.     Selling or conveying interests in SMRB to investors without the required vetting and prior approval of the Washington State Liquor and Cannabis Board subjected SMRB to potential cancellation of its license.

28.     Russell knew that he could not transfer or sell any interest in SMRB to RTSI or to any third-party investor without pre-approval of the Washington State Liquor and Cannabis Board.  Nevertheless, Defendants never sought or obtained approval from the Washington State Liquor and Cannabis Board for RTSI to acquire any interest in SMRB, or for any third-party investors to acquire an interest in SMRB.

### Defendants Offered and Sold Unregistered Securities in Violation of the Federal Securities Laws.

29.     Beginning in approximately August 2015 and continuing until at least December 2017 (the "Relevant Time Period"), Defendants offered and sold securities in SMRB to at least twenty-five investors residing in several states, including California, Washington, Arizona, and Texas (collectively, the "Investors").

30.     The Investors paid money in the form of cash, checks, bank transfers, and wire transfers to effectuate the purchase and sale of the securities from Defendants.  In total, the Investors invested approximately $4.85 million.

### Defendants' Methods for Recruiting Investors into the Scheme

31.     Griffithe was primarily responsible for identifying potential investors, selling the investment, collecting and distributing money related to the investment, and communicating with Investors through one-on-one communications, newsletters,

emails, teleconferences, and through RTSI's website.

32.    Most potential investors came from direct solicitations by Griffithe or through referrals from Griffithe's friends and associates, whom Griffithe sometimes compensated with cash or participation in the investment.

33.    Defendants also gained introductions to potential new investors through word-of-mouth referrals from other Investors.

34.    Additionally, beginning on or around June 6, 2016, Defendants solicited the general public to invest through a public Internet website, http://www.investgap.com. The website provided content and links to an investment overview, pictures, a document entitled "Top 10 Reasons GAP is a Solid Investment," and additional written materials about the company's management and plans for growth and expansion.  The website offered visitors the opportunity to sign up for "periodic investment updates" and to subscribe to a mailing list.  Additionally, the website provided the telephone number of one of Griffithe's employees for potential investors to call for more information about investing.

35.    In connection with the offers and sales of the securities, Griffithe would sometimes communicate directly with potential investors by phone or electronic communications.

36.    In connection with the offers and sales of the securities, Griffithe and/or Russell would sometimes meet personally with potential investors, including giving tours of SMRB's facility.

37.    Most of the Investors lured into the scheme were individuals who invested funds derived from their personal savings, retirement savings, inheritances, or loans from family members.

***Defendants Misrepresented the Nature of the Investment and Uses of Proceeds***

38.    In connection with the offer and sales of securities to Investors, during the Relevant Time Period, Defendants made false representations orally and in written materials about the nature of the securities interests being offered and sold

7

and how they would use the money raised from Investors in the offerings.

39.    Defendants told Investors orally and in written materials, including in the investment contracts, marketing brochures, and direct communications, that they were purchasing an ownership interest, or equity, in SMRB.

40.    Defendants told Investors orally and in written materials to expect profit distributions based on the revenue SMRB generated from the Defendants' efforts.

41.    Defendants also told Investors orally and in written materials that the proceeds of their investment would be used for purposes related to SMRB's business, including purchasing equipment or machinery; installing equipment and fixtures at SMRB's Anacortes, Washington facility; acquiring additional real estate; or expanding the existing footprint of SMRB's facility.

42.    In connection with the offers and sales of the securities, during the Relevant Time Period, Griffithe and Russell met with and gave tours of SMRB's facility in Anacortes, Washington to several Investors or prospective investors, including people who resided outside the State of Washington.

43.    Russell maintained the appearance of SMRB's Anacortes facility in a manner that allowed him to convince these visitors that their incremental investment capital was needed and would be used to finalize certain improvement projects.  For example, Russell showed some prospective investors obsolete or surplus equipment and fixtures that he falsely said were going to be installed when he received money from their investments.

44.    To effectuate their investment with Defendants, most Investors signed a contract entitled "Purchase of Shares Interest Agreement."  This investment contract promised the Investor an "ownership interest in SMRB," as well as a share of SMRB's "net proceeds" or "total net profits" in proportion to his or her "Ownership Interest," to be disbursed on a quarterly basis.  The Purchase of Shares Interest Agreements identified RTSI as the "seller" from which the Investor was purchasing securities (*e.g.,* "Purchaser is acquiring ownership interest in SMRB, LLC owned by

RTSI"), and stated that "Robert Russell and Guy Griffithe are 100% owners of Renewable Technology Solution, Inc."

45.     Griffithe wrote the Purchase of Shares Interest Agreements using a form he found on the Internet, and also signed the contracts in his capacity as an officer of RTSI.

46.     Some of the Purchase of Shares Interest Agreement forms contained a signature line identifying Russell as the President of RTSI.  At least seven Investors executed versions of the Purchase of Shares Interest Agreement that contained a signature purporting to be Russell's.

47.     In approximately August 2016, Griffithe formed GAP to act as a successor-in-interest to RTSI for the purpose of offering and selling the SMRB securities to Investors.

48.     Griffithe asked existing Investors to rescind their original transactions involving RTSI and to "subscribe" to a new offer and sale of securities by GAP.  Not all Investors rescinded their earlier transactions or entered into subsequent GAP Subscription Agreements.

49.     Beginning in approximately August 2017, Griffithe offered and sold securities to new Investors using "Subscription Agreements" executed by Griffithe as Manager of GAP.

50.     The Subscription Agreements represented that GAP had purchased a 49% stake in SMRB.  The Subscription Agreements offered Investors a "membership interest" in GAP that purportedly would entitle the Investor to receive a proportional share of SMRB's net revenue.

51.     During the Relevant Time Period, Griffithe and Russell communicated regularly with one another about the efforts to raise money from Investors, and thereby each knew, or was reckless in not knowing, that numerous Investors had purchased securities in the offerings that purported to convey an ownership stake and/or profit-sharing interest in SMRB.

52.     During the Relevant Time Period, Griffithe and Russell also communicated regularly with one another about how they were using the proceeds of the Investors' investments, and thereby each knew, or was reckless in not knowing, that Defendants were expending Investor money for purposes not disclosed, or contrary to the disclosures, they had made to Investors.

### Griffithe, RTSI, and GAP Violated the Registration Provisions of the Federal Securities Laws

53.     No registration statements were filed with the Commission or in effect as to any of the securities transactions described herein.

54.     No exemptions to the registration requirements of the federal securities laws were applicable to any of transactions with Investors described herein.

55.     Griffithe, RTSI, and GAP made no attempt to comply, and did not comply, with the federal securities laws regarding the registration, or the exemption from registration, of securities offered or sold to Investors in interstate commerce.

### Defendants Offered and Sold Fictitious Securities to Investors

56.     Defendants' misstatements and deceptive conduct defrauded Investors into believing that they were purchasing ownership interests in SMRB and/or that they were to receive profit distributions based on the net income generated by SMRB from its cannabis operations.

57.     However, the securities interests Defendants sold to Investors were fictitious, as they did not actually convey any *bona fide* ownership or income-sharing stake in SMRB.

58.     Defendants, acting with scienter, engaged in sham transactions in which they obtained millions of dollars from Investors by selling them essentially worthless securities.

59.     Defendants' representations to Investors that they were acquiring equity in SMRB or a right to share in the company's profits were material to Investors' investment decisions.  As described herein, these representations were fraudulent

because, in reality, Defendants did not sell Investors anything of actual economic substance or value.

60.     Defendants were at least reckless in selling securities to numerous out-of-state Investors who were prohibited under Washington law from investing in SMRB, and to Investors whose involvement and investments had not been approved by the Washington State Liquor and Cannabis Board.

61.     Defendants also did not treat the Investors as true stakeholders of SMRB with any beneficial rights to SMRB's profits or equity.

62.     For example, Defendants did not provide Investors with certificates or other documentation related to the interests they had purchased.

63.     Defendants also did not create or maintain basic records identifying the Investors, when they invested, how much they invested, or what was returned to Investors in the form of dividend or profit distributions, interest, or principal.

64.     Defendants did not account for the Investors' interests in any form in their respective financial statements and accounting books and records; did not identify any of the Investors on their returns filed with the Internal Revenue Service; and otherwise kept no records the amounts of equity the Investors owned.

65.     In fact, throughout the continuation of the scheme, as described herein, Defendants disregarded Investors as *bona fide* stakeholders in SMRB by lying to them, cheating them, and misusing the proceeds of their investments.

### Defendants Misused Investor Funds for Extravagant Luxuries, Inappropriate Personal Expenditures, and Unrelated Business Ventures

66.     During the Relevant Time Period, Defendants induced Investors to invest by making representations that their money would be used for the purpose of operating and expanding SMRB's marijuana business.  As described herein, Defendants misused Investor money contrary to Investors' expectations to unjustly enrich Griffithe, Russell, Sonja Russell, RTSI, GAP, SMRB, and others.

///

67.    Most Investors purchased their securities from Defendants via check, wire transfer, or bank transfer.  Their money was deposited into RTSI and GAP bank accounts controlled by Griffithe.

68.    Investor money was commingled with other funds in RTSI's or GAP's bank accounts.  Griffithe, RSTI, and GAP did not make or maintain records to account for their uses of Investor money.

69.    Of the approximately $4.85 million raised from Investors, Griffithe spent over $1.8 million for personal uses and other inappropriate expenditures for himself, Russell, and others, during the Relevant Time Period, including payments towards:

a.    2008 Bentley Continental,

b.    2012 Mercedes Benz C Class,

c.    2013 Ford Mustang,

d.    2015 Porsche Panamera,

e.    $250,000 towards a 65-foot Pacific Mariner yacht bought by Russell and Sonja Russell,

f.    $25,000 towards a 42-foot Hydrasport custom power boat,

g.    Expenditures for Griffithe's unrelated business ventures, including Bridgegate Pictures Corp. and other of Griffithe's undertakings in the movie industry.

70.    Griffithe also withdrew substantial sums of cash from RTSI's bank accounts.

71.    In addition, during the Relevant Time Period, Griffithe transferred approximately $1.7 million to Russell's personal bank accounts that he co-owned with Sonja Russell.  Russell commingled the $1.7 million of Investor money with his and his wife's own funds, and did not maintain accounting records reflecting if or how he spent the Investors' funds.

72.    Russell's commingling of money and lack of record-keeping obscured the ways in which he used money derived from Investors.

73.     However, even if Russell used Investor money that was deposited into his personal bank account to finance, reimburse, or to later buy property or make improvements related to the marijuana business, SMRB, Russell, and Sonja Russell were the sole beneficiaries of those expenditures.  None of those expenditures inured to the benefit of the Investors, because neither Russell, SMRB, nor Washington law regarded the Investors as having purchased any lawful ownership stake in the company that would give them a claim to SMRB's assets or operating profits.

74.     Defendants concealed from Investors that Griffithe and Russell misspent their money on expenditures unrelated to SMRB, including buying cars and yachts, paying personal living expenses, funding unrelated businesses, and paying for other things that did not benefit Investors.

### Defendants Misled Investors about SMRB's Profitability

75.     Defendants misled Investors into believing that their investment was profitable, despite Defendants knowing that SMRB had never generated a profit.

76.     To create and maintain this false appearance of profitability, Griffithe, RTSI, and GAP lied to Investors and undertook elaborate deceptive acts to make it appear that Investors were receiving returns on their investments from the business operations of SMRB, including issuing misleading financial statements and paying Investors money that falsely purported to be profit distributions.

77.     SMRB created "Profit & Loss" statements that purported to present the income generated and expenses incurred by SMRB from its operations during the relevant reporting periods.

78.     However, certain versions of the Profit & Loss statements omitted or understated SMRB's actual expenses and created the appearance that SMRB was profitable, when it was not.

79.     SMRB provided these financial statements to Griffithe, RTSI, and GAP. Griffithe, RTSI, and GAP, in turn, distributed SMRB's Profit & Loss reports to the Investors.

80.     Russell and SMRB were at least reckless in disregarding the risk that SMRB's Profit & Loss statements would be provided to Investors and create the misimpression that the SMRB was profitable, which Russell knew was untrue.

81.     Defendants, who all knew that SMRB was never profitable, were at least reckless in failing to contemporaneously disclose to Investors that the Profit & Loss statements omitted or understated the actual expenses incurred by SMRB and that the "profits" shown therein were untrue.

82.     Investors also believed SMRB was profitable because they received newsletters and other updates from Defendants that falsely touted SMRB's financial success. One newsletter dated June 30, 2016, referred to SMRB's "modest profit." Another newsletter from November 2017, stated: "We are working with a 40% profit margin about [sic] acquisition, packaging and distribution to the retailers.  This along with the flower will move us into the gross revenue range of 1.3-1.4M per month with profits at 40-42%.  WE ARE HERE!!!!!!"  Griffithe authored these false statements and issued them to Investors with Russell's approval.

83.     To further the illusion of SMRB's profitability, between approximately May 2016 and December 2017, Griffithe paid money to Investors from RTSI's and GAP's bank accounts. Griffithe controlled the bank accounts from which these payments were made.

84.     In total, Griffithe paid Investors at least $340,000, mostly in the form of checks that referred to these payments on the memo line as "distributions."

85.     The misleading financial statements, newsletters that portrayed SMRB as profitable, and purported distribution payments operated as a fraud or deceit on Investors to make them believe that their investments had value and were generating profits.

86.     Creating the illusion of profitability enabled Defendants to prolong the scheme.  For example, some Investors who believed the investments were generating returns referred new potential investors to Defendants.

*Griffithe, RTSI, and GAP Operated a Ponzi Scheme*

87.     Griffithe, RTSI, and GAP operated a Ponzi scheme in which they paid money to Investors that purported to be distributions of profits generated by SMRB, but were in fact funded in part out of the capital contributed by other Investors.

88.     In approximately December 2017, RTSI and GAP stopped paying Investors purported profit distributions.  By this time, RTSI's and GAP's bank accounts had been largely depleted due to Griffithe's profligate spending, his inability to obtain new capital from investors, and SMRB's inability to generate profits from its operations.

89.     As Investors became increasingly concerned that their investment was no longer paying returns, on or about August 16, 2018, Griffithe and Russell held a conference via telephone to provide a company update and to answer numerous questions from Investors.

90.     On or about the same date, Griffithe emailed a "Q&A" to certain Investors to address some of the Investors' concerns prior to the conference call.  Russell reviewed, edited, and approved the contents of the email before its transmission to the Investors.  The email to Investors was signed from "Bob," referring to Russell.

91.     In the email and on the conference call, Griffithe admitted that SMRB was never profitable and did not provide any of the cash to fund the distribution payments to Investors.

92.     In the August 16, 2018, email and conference call, Griffithe falsely characterized the distributions he had paid as "gifts" that he personally funded in "good faith."  Griffithe knew the distributions were not personal "gifts," because they were partially funded out of the Investors' own money.  Griffithe also was acting with a high degree of scienter, or intent to deceive, when he made the payments, and not out of "good faith."

///

15

93.     For at least a year and a half prior to the August 2018 conference call and corresponding email, Russell knew that Griffithe was making so-called distributions payments that Investors believed were paid out of the profits of SMRB. Russell knew that the distributions were not actually funded by Russell or SMRB, and that SMRB was not profitable.

94.     Griffithe privately told Russell and one other person on or about February 1, 2017, that the purported profit distributions he had paid to Investors was "just money that I've come up with in closing other deals."

95.     Indeed, between May 2016 and December 2017, Griffithe, RTSI, and GAP paid Investors at least $340,000 in phony distributions. As is characteristic of a Ponzi scheme or pyramid scheme, Griffithe used money he obtained from selling SMRB securities to Investors to fund, in part, the distributions paid to other Investors. None of the money distributed to Investors actually derived from profits generated by SMRB's business operations.

96.     As an example, on January 25, 2017, one Investor wrote a check to RTSI for $100,000 to purchase, as indicated on the memo line of the Investor's check, "1% ownership." At the time of this deposit, RTSI's bank accounts were overdrawn by more than $300. As a result, all of the following outflows were necessarily funded from this Investor's deposit. On the very same day the Investor gave his check, Griffithe wrote and signed at least six checks drawn from RTSI's account payable to earlier Investors for purported "4th Quarter Distributions," totaling approximately $39,000. Griffithe made other expenditures from the new Investor's money, including withdrawing $25,000 in cash and making payments for projects related to his movie business. However, Griffithe did not transmit any of this capital to SMRB's bank accounts, as the Investor intended. Within a week, only about $1,200 of the Investor's capital remained in RTSI's bank account.

97.     As a result of the fraud alleged herein, Investors suffered financial losses of approximately $4.85 million.

## FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (*Against All Defendants*)

98.     The Commission realleges and reincorporates paragraphs 1 through 97 as if fully set forth herein.

99.     By reason of the conduct described above, Defendants, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, or of any facility of any national securities exchange, directly or indirectly, knowingly or recklessly (1) employed devices, schemes, or artifices to defraud and/or (2) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading and/or (3) engaged in acts, practices, or courses of business which operates or would operate as a fraud or deceit upon any persons, including purchasers or sellers of the securities.

100.    By reason of the actions alleged herein, Defendants violated Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

101.    Unless enjoined or otherwise restrained, Defendants will continue to violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)
### (*Against All Defendants*)

102.    The Commission realleges and reincorporates paragraphs 1 through 97 as if fully set forth herein.

103.    Defendants, directly or indirectly, by use of means of instrumentalities of transportation or communication in interstate commerce or by use of the mails, in the offer or sale of securities: (a) knowingly or recklessly employed devices, schemes

or artifices to defraud; (b) knowingly, recklessly, or negligently obtained money or property by means of untrue statements of material fact, or have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) knowingly, recklessly, or negligently engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchasers of securities.

104.   By reason of the actions alleged herein, Defendants violated Securities Act Sections 17(a)(1) and 17(a)(3) [15 U.S.C. § 77q(a)(1), (3)].  By obtaining money and property by means of the various materially false and misleading written and oral statements, Defendants also violated Securities Act Section 17(a)(2) [15 U.S.C. § 77q(a)(2)].

105.   Unless enjoined or otherwise restrained, Defendants will continue to violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## THIRD CLAIM FOR RELIEF
### Violations of Securities Act Section 5(a) and 5(c)
### (*Against Defendants Griffithe, RTSI, and GAP*)

106.   The Commission realleges and reincorporates paragraphs 1 through 97 as if fully set forth herein.

107.   Defendants Griffithe, RTSI, and GAP directly or indirectly, singly and/or in concert with others: (1) without having any registration statement in effect as to the securities transactions, (a) made use of the means or instrumentalities of transportation or communication or the mails in interstate commerce to sell securities through the use or medium of a prospectus or otherwise, or (b) carried or caused to be carried such securities for the purpose of sale or for delivery after sale; and (2) made use of the means or instrumentalities of transportation or communication or the mails in interstate commerce to sell or offer to buy through the use or medium of a prospectus or otherwise securities as to which a registration statement had not been

filed as to such securities.

108.   By reason of the actions alleged herein, the defendants violated Sections 5(a) and (c) of the Securities Act [*15 U.S.C. § 77e(a) & (c)*].

109.   Unless enjoined or otherwise restrained, the defendants will continue to violate Securities Act Sections 5(a) and (c) [*15 U.S.C. § 77e(a) & (c)*].

**FOURTH CLAIM FOR RELIEF**
**Unjust Enrichment**
**(*Against Relief Defendant Sonja Marie Russell*)**

110.   The Commission realleges and reincorporates paragraphs 1 through 97 as if fully set forth herein.

111.   As described above, Defendants engaged in a fraudulent scheme to defraud investors in connection with the offer, purchase, or sale of unregistered securities of SMRB and to use the money raised in such offerings to unjustly enrich themselves, Relief Defendant Sonja Russell, and others in the form of cash, property, and other benefits.  Sonja Russell shared at least two bank accounts with Russell into which approximately $1.7 million of investor money was deposited.  Also, as one of the two owners and governor members of SMRB along with Russell, Sonja Russell also benefitted from property acquired, improvements made, and expenses paid with investor money on behalf of SMRB.  Sonja Russell was also unjustly enriched by the expenditure of $250,000 of investor money towards the purchase of a 65-foot Pacific Mariner yacht that she co-owns with Russell.  Sonja Russell has no legitimate claim to the funds, property and benefits described above, and has thus been unjustly enriched under circumstances in which it is not just, equitable, or conscionable for her to retain such profits.

///

///

///

///

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

(a)     finding that Defendants violated the antifraud provisions of the federal securities laws as alleged herein;

(b)     finding that Defendants Griffithe, RTSI, and GAP violated the registration provisions of the federal securities laws as alleged herein;

(c)     permanently enjoining each Defendant from violating Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5 thereunder;

(d)     permanently enjoining Defendants Griffithe, RTSI, and GAP from violating Securities Act Sections 5(a) and (c),

(e)     permanently enjoining Defendant Griffithe from directly or indirectly, including, but not limited to, through any entity owned or controlled by Griffithe, participating in the issuance, purchase, offer, or sale of any security in an unregistered offering by an issuer, provided, however, that such Order shall not prevent him from purchasing or selling securities for his own personal account;

(f)     ordering each Defendant to disgorge all ill-gotten gains, plus prejudgment interest thereon, wrongfully obtained as a result of their illegal conduct;

(g)     ordering the Relief Defendant to disgorge all ill-gotten gains, plus prejudgment interest thereon, obtained as a result of Defendants' illegal conduct alleged in this Complaint;

(h)     ordering each Defendant to pay civil penalties pursuant to Securities Act Section 20(d) [*15 U.S.C. § 77t(d)*] and Exchange Act Section 21(d) [*15 U.S.C. § 78u(d)*];

(i)     permanently barring Defendant Griffithe, pursuant to Securities Act Section 20(e) [*15 U.S.C. §77t(e)*] and Exchange Act Section 21(d)(2) [*15 U.S.C. §78u(d)(2)*], from serving as an officer or director of any issuer that has a class of

securities registered pursuant to Exchange Act Section 12 [*15 U.S.C. §78l*] or that is required to file reports pursuant to Exchange Act Section 13 [*15 U.S.C. §78m*]; and

(j)    granting such other relief to the Commission as the Court may deem just and proper.

Dated:  January 21, 2020

*/s/ Gary Y. Leung*
Gary Y. Leung
Duane K. Thompson
Counsel for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Phone: (202) 551-7159
Fax: (202) 551-9246
Email: thompsond@sec.gov

**Of Counsel:**
Charles J. Felker
Adam J. Eisner
HelenAnne Listerman

# DEMAND FOR JURY TRIAL

Pursuant to Rule 39 of the Federal Rules of Civil Procedure and C.D. Cal. L.R. 38-1, Plaintiff demands that this case be tried to a jury.

Dated:  January 21, 2020

*/s/ Gary Y. Leung*
Gary Y. Leung
Duane K. Thompson
Counsel for Plaintiff
Securities and Exchange Commission
100 F Street, N.E.
Washington, DC 20549
Phone: (202) 551-7159
Fax: (202) 551-9246
Email: thompsond@sec.gov

**Of Counsel:**

Charles J. Felker
Adam J. Eisner
HelenAnne Listerman