**CORRIGAN & MORRIS, LLP**
Brian T. Corrigan (Cal Bar No. 143188)
bcorrigan@cormorllp.com
Stanley C. Morris (Cal Bar No. 183620)
scm@cormorllp.com
12300 Wilshire Boulevard, Suite 210
Los Angeles, CA 90025
Telephone: (310) 394-2800
Facsimile: (310) 394-2825

*Attorneys for Defendant Robert Russell*

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>GUY SCOTT GRIFFITHE, ROBERT WILLIAM RUSSELL, RENEWABLE TECHNOLOGIES SOLUTION, INC., GREEN ACRES PHARMS, LLC, and and SMRB, LLC, Defendants,<br><br>And SONJA MARIE RUSSELL, Relief Defendant | Case No.: 20-CV-0124  DOC-(JDEx)<br><br>**DECLARATION OF RAELENE BUSHBECK IN SUPPORT OF DEFENDANT ROBERT RUSSELL'S OPPOSITION TO PLAINTIFF'S MOTION FOR FINAL JUDGMENT**<br><br>**Judge: Hon. David O. Carter** |

1

I, RAELENE BUSHBECK, hereby declare under penalty of perjury, in accordance with 28 USC § 1746, that the following is true and correct, that I am over 18 years of age, and I am competent to testify to the matters stated herein:

1. I hold a degree in accounting and finance from the University of Washington's Foster School of Business. I have been involved in dozens of forensic analysis cases involving, but not limited to, expense analysis, asset disclosure and asset tracing as well as pension valuation and separate property tracing in dissolution cases. I work freelance with forensic CPAs and family law attorneys and provide litigation support services on a contract basis. I appear as an expert witness in King County Superior Court. I am a member of the American Institute of Certified Public Accountants, the Institute of Divorce Financial Analysts and the International Academy of Collaborative Professionals.

2. I have personal knowledge of the following facts and, if called as a witness, could and would testify competently thereto.

3. To trace the flow of money and calculate the figures stated I reviewed 603 documents totaling 1,491 pages. The documents included the SMRB LLC's Quickbooks, receipts and invoices, wire transfer receipts, bank statements, business leases and records. In addition I reviewed documents produced by the SEC, including its expert's report. These summaries and the calculation of the total receipts of funds and expenses of funds did not require any scientific, technical, or specialized knowledge.

4. Specifically, I reviewed all of the bank accounts that were identified by the SEC, listed in Attachment "A" hereto, as controlled by Defendants, Robert and Sonja Russell and requested that Mr. and Mrs. Russell provide me with all of the bank accounts pertaining to money received and spent relating to SMRB's business.

5. I then asked the Russells to provide me with underlying source documents relating to all of the distributions on the bank records that the Russells

claimed were legitimate expenses for SMRB including, but not limited to, lease documents, invoices and receipts.

6. I also reviewed the SEC's memorandum of points and authorities filed with the court in support of its request for Final Judgment, the Expert Report prepared by Ronald Seigneur dated December 29, 2020 insofar as it relates to funds flowing to the Russell from RTSI/GAP and Ms. Shipra Well's declaration filed with this court.

7. Table 5 from the SEC Expert Report of Ronald Seigneur details alleged funds transferred from RTSI to the Russells in the total amount of $2,108,300. Table 3 in the Declaration of Shipra Wells, commencing at page 10, acknowledges these deposits save for two deposits of $50,000 on 10/12/2016 and 12/1/2016 respectively. Ms. Wells found that $2,008,300 funds were transferred from RTSI/GAP accounts to the Russells, of which $1,695,306.09 were attributable to Investor funds.

## **Tracing**

8. My tracing concludes that the Russells received the $2,008,300 funds itemized in Ms. Wells' Declaration from RTSI/GAP accounts. No deposits were made to the Russell's accounts on 10/12/2016 or 12/1/2016 as alleged by Ronald Seigneur. I located two $50,000 deposits twelve months later, on 10/12/2017 and 12/1/2017, making the total deposits of funds flowing from Mr. Griffithe and/or RTSI $2,108,300.

9. Ronald Seigneur also alleged that the following funds were transferred to third parties from RTSI/GAP accounts for boat payments on behalf of the Russells and are unrelated to the development of the cannabis growing and processing business:

6/24/2016   $250,000   RTSI to Pacific Maritime – Payment on Boat
5/3/2017    $100,000   RTSI to Plantation Boat Mart – Payment on Boat

3

I have not been provided any books or records to confirm or deny this allegation.

10. Conversely, funds flowed from the Russells back to GAP/RTSI. On November 18, 2016, Sonja Russell withdrew $180,000 from the parties' joint account at Wells Fargo x4567 and deposited the funds into Guy Griffithe's account. Evidence of this withdrawal/deposit is included at Item 51, **Exhibit 3**. Given these funds were returned, they should be offset against funds Mr. Griffithe transferred to or on behalf of the Russells.

11. I also reviewed certain litigation settlement documents and the bank records showing payment by the Russells directly to two individuals, Mr. Amebro (via Speckman Law Firm) and Mr. Bagot, whom Mr. Russell identified as investors of RTSI. Those payments totaled $254,887.50. Attached hereto at **Exhibit 1** are copies of those settlement documents and supporting bank records showing payment of $254,887.50. As I understand it, Ms. Wells erroneously elected to only give Mr. Russell credit for $80,000 (the amount one investor allegedly paid Mr. Griffithe), as opposed to the full amount of Mr. Russell's expense to both of Mr. Griffithe's investors (*See Wells Declaration at Paragraph 18(d)*). The books and records at **Exhibit 1** reflect that Mr. Russell's business expense was $254,887.50, not $80,000.

*Table 1: Settlement Funds*

|  | Total |
|---|---|
| Settlement Funds: Amebro | $115,000.00 |
| Settlement Funds: Bagot | $139,887.50 |
| **TOTAL** | $254,887.50 |

12. In summary, net total funds received by the Russells from RTSI/GAP prior to accounting for outflows are as follows:

4

*Table 2: Net Funds received from RTSI/GAP Accounts*

| SOURCE | AMOUNT |
|---|---|
| (1) Total from RTSI/GAP Account | $2,108,300.00 |
| (2) Wells' Reduction – Non Investor Funds | ($ 312,993.91) |
| (3) 3rd Party Boat Payments (Unverified) | $ 350,000.00 |
| **TOTAL** | ***$2,145,306.09*** |
| (4) LESS: Funds returned to Guy Griffithe | ($ 180,000.00) |
| (5) LESS: Settlement Funds paid to Amebro/Bagot | ($ 254,887.50) |
| **NET RECEIPTS BEFORE EXPENSES** | ***$1,710,418.59*** |

13.  Ronald Seigneur provided detail on three lease payments made directly to Stage Stop 6 LLC by way of Wire to Alpine Bank as follows:

| | |
|---|---|
| 1/3/2017 | $ 36,700 |
| 4/4/2017 | $ 36,700 |
| 5/3/2017 | $ 36,700 |
| | $110,100 |

SMRB entered into a lease agreement with Stage Stop 6 LLC on November 30, 2016 to lease the premises at Padilla Heights suites for a term of ten years commencing December 1, 2016.  I have examined a copy of the lease instrument signed by Robert Russell on behalf of SMRB, LLC dba Green Acres Pharms.

Under the lease agreement, SMRB LLC was obligated to make the following payments in the initial three years:

| | |
|---|---|
| Security deposit: | $146,800.00 |
| Leasing fee: | $ 20,000.00 |
| Monthly Rent (Year 1) | $ 36,700.00 |
| Monthly Rent (Year 2) | $ 37,801.00 |
| Monthly Rent (Year 3) | $ 38,935.00 |

5

The three direct payments to Stage Stop 6 LLC, referenced by Ronald Seigneur were legitimate business expenses. The funds have been included in the monies received from RTSI/GAP. However, the Russells did not receive this money, it went to payment of a business expense, and should correspondingly be recorded as such.

In summary, the net lease expenses not included in the cash outflows addressed later in this declaration are as follows:

*Table 3: Net Lease Non-Cash Outflows*

|  | Total |
|---|---|
| Funds Paid Directly to Stage Stop 6 by RTSI on 1/3/17, 4/4/17, 5/3/17 | $110,100.00 |
| LESS Lease Obligation to Stage Stop 6 on 1/3/17, 4/4/17, 5/3/17 | ($110,100.00) |
| **TOTAL** | ($0) |

14. I have examined the bank statements outlined in **Attachment "A"** hereto, together with invoices relating to payments which have been identified by the Russells as legitimate business expenses relating to the set-up and operations of the cannabis growing and processing business. I have scheduled out each payment in the attached Schedules 1 through 9 attached to **Exhibit 2** based upon the account from which each payment was made. The payments have been reconciled against the bank statements.

- I have personally reviewed hundreds of invoices and taken a significant sample which is produced hereto and included as Reference Set **Exhibit 3**[1].
- I have personally reviewed the wire transaction receipts which are produced hereto and included as Reference Set **Exhibit 4**.

---

[1] The reference set identifier can be located on the transaction entry in Schedules 1 through 9.

- I have personally reviewed countless supporting documents including lease and other documents, some of which are produced hereto and included as Reference Set **Exhibit 5**.

15. Each of the expenses identified in the Schedules attached to **Exhibit 2** have been verified in the Bank Statements, except for those specified as cash or credit card transactions (which have been verified by receipt), unless stated otherwise. The total outflows, across all accounts, broken into categories, detailed in the table below is **$2,757,082.69**.

*Table 4: Business Expenses*

| Expense Category | Amount |
| --- | --- |
| Accountant | $2,650.00 |
| Advertising | $1,250.00 |
| Alarm | $4,001.00 |
| Architect | $3,005.83 |
| Auto Lease | $22,409.18 |
| Bank Fees | $2,891.72 |
| Building Lease | $701,225.91 |
| Electrical | $708,255.94 |
| Employee Lodging | $109.56 |
| Equipment – Oil Machine (Brian Martin) | $550,000,00 |
| Fire | $21,896.39 |
| Forklift Lease | $16,760.44 |
| Garbage | $1,606.44 |
| HOA Fees | $15,259.53 |
| Insurance | $2,455.66 |
| Irrigation | $1,058.03 |
| Legal Fees | $16,426.20 |
| License | $2,461.83 |
| MLC Unit Purchase | $30,000.00 |
| Packaging | $20,514.00 |

| | |
|---|---|
| Payroll Taxes | $32,200.62 |
| Phone/Internet | $6,062.84 |
| Product | $57,654.76 |
| Professional Fees | $23,413.28 |
| Property Tax | $17,137.70 |
| R&M | $1,296.66 |
| Security | $48,514.84 |
| Signage | $808.33 |
| Software | $4,730.00 |
| Storage | $729.97 |
| Storage Lease | $4,760.54 |
| Supplies | $129,377.57 |
| Unit Payments | $40,500.00 |
| Unit Purchase | $118,100.00 |
| Utilities | $146,407.56 |
| Vehicles | $510.36 |
| Wire Fees | $640.00 |
| TOTAL | **$2,757,082.69** |

16. The total outflows for those expenses listed in clause 15 above, for which source documents in addition to banking records (ie. invoices, receipts and/or lease documents) have been produced herewith at **Exhibits 3, 4, 5** is **$2,060,128.64**.

17. I concluded that the Russells received $2,108,300, of which, based on Ms. Wells analysis of Investor contributions, $1,795,306.09 relate to investor contributions. In addition it is alleged they received 3rd party boat payments of $350,000 and payments to Stage Stop 6 of $110,100 between September 9, 2015 and April 5, 2017. As confirmed by the documents attached to **Exhibit 5**, the parties paid settlement funds totaling $254,887.50 to Amebro and Bagot; they deposited $180,000 back to Mr. Griffithe's account; and the payment to Stage Stop 6 covered three month's lease payments of $110,100.

| | |
|---|---|
| Table 2 : (1) + (2) Total from RTSI/GAP Accounts with Wells adjustment | $1,795,306.09 |
| Table 2 : (2) 3rd Party Boat Payments | $350,000.00 |
| Table 3 : Payments to Stage Stop 6 | $110,100.00 |
| **SUB-TOTAL** | **$2,255,406.09** |
| LESS | |
| Table 1 : Settlement Funds Amebro/Bagot | ($254,887.50) |
| Table 2 : (3) Guy Griffithe – Returned Funds | ($180,000.00) |
| Table 3 : Net Lease Non-Cash Outflows | ($110,100.00) |
| **TOTAL NET** | **$1,710,418.59** |
| Table 4 : Business Expenses | ($2,756,082.69) |
| **TOTAL – Cash deficit** | **($1,045,664.10)** |

18. From the analysis of the bank accounts included in Attachment "A" and the documents referenced herein, it is my conclusion that Mr. Russell spent **$1,045,664.10** *more* on SMRB's business operations than the total received from the RTSI/GAP accounts.

19. Attached hereto at **Exhibit 6** are true and correct copies of the bank statements, copies of checks and deposit records that I relied on in reaching my conclusions.

## Key Differences in Findings

20. There are some fundamental key reasons for the disparity between my findings and those in the report of Ronald Seigneur and the Declaration of Shipra Wells.

    a. My engagement is by the Russells to trace the flow of funds outlined in Table 5 of the report of Ronald Seigneur. These funds flowed to accounts owned and/or controlled by the Russells from Guy Griffithe and/or RTSI. I traced cash inflows of $2,108,300 to the Russells' group of accounts

9

directly from RTSI/GAP accounts. Shipra Wells traced inflows of $2,008,300, of which she claimed $1,695,306.09 was investor's money. I am unable to discern original ownership of funds given *all funds* came from Mr. Griffithe and/or RTSI. For the purposes of this analysis, I have assumed the benefit of Ms. Wells' knowledge and reduced the calculation of receipts by the $312,993.91 amount unrelated to investors.

b. Shipra Wells erroneously excluded two $50,000 receipts by the Russells on 10/12/2017 and 12/1/2017, likely because Ronald Seigneur had reported these payments as having been received on 10/12/2016 and 12/1/2016. These funds were received by the Russells. I do not have knowledge as to whether they were investor funds. I have included these receipts in my analysis.

c. Shipra Wells erroneously excluded expenses incurred by the Russells prior to their receipt of the first transfer of funds from Mr. Griffithe, despite their having incurred expenses for the business for some nine months prior to Mr. Griffithe providing any funds. Between January 23 and September 9, 2015, the Russells spent **$353,748.07** into pursuing the development of the cannabis growing and processing business, and these business expenses were excluded from the SEC audit and analysis (Page 14 of 17, Document 87, Page ID #512).

d. The Russells paid a total of **$254,887.50** in settlement proceeds to Mr. Griffithe's investors. These funds were a business outflow, paid on Mr. Griffithe's behalf. Shipra Wells only references one investor, rather than two, and only gives credit for $80,000 of the $254,887.50 actually paid. Evidence of the $254,887.50 payments are provided at **Exhibit 1** herewith. (Page 14 of 17, Document 87, Page ID #512).

e. Ronald Seigneur stated at page 52 of his report that the QuickBooks records for Oceanside were unreliable. He stated further, at page 53, that

> *"it is notable that many of the expenses recorded as paid by the Russells from their personal resources could not be verified as to the source of those payments"* ... and *"to validate that expenditures were made as booked, a careful review of previously undisclosed bank accounts, credit card statements, or receipts for cash payments **would be** required"*.

I agree with Mr. Seigneur. Ms. Wells did not conduct the review necessary to validate that expenditures were made, and accordingly did not include the vast majority of the Russell's expenditures in her analysis. I did not rely upon the QuickBooks records, but rather, I independently verified each expenditure against the bank statements and compiled independent schedules categorizing each expense based on information provided by the client. I then spent countless hours going through boxes of invoices and receipts and personally cross verifying hundreds of transactions with the source documents and creating the reference set attached hereto, **EXHIBIT 3, 1-51.** I followed precisely the protocol Ronald Seigneur stated *would be* required, but which was not followed for the SEC analysis. For this reason, my total calculation of business expenses from September 9, 2015 is $2,757,082.69, compared to Ms. Wells' $1,315,061.06; a difference of **$1,268,281.56**.

I declare under the penalty of perjury that the foregoing is true and correct.

Dated August 13, 2021 at Kirkland, WA

_____
RAELENE BUSHBECK

11